FILED

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS** 2004 OCT 28 P 3: 41

CIVIL ACTION NO.
U.S. DISTRICT COURT
DISTRICT OF MASS.

RUDY K. MEISELMAN

04 CV 12304 WGY

        Plaintiff

MJ- JLA

vs.

FINANCIAL RESOURCES NETWORK, INC.,
FINANCIAL RESOURCES NETWORK, INC.
PROFIT SHARING PLAN
ROSALIND HERMAN, TRUSTEE OF THE
FINANCIAL RESOURCES NETWORK, INC.
PROFIT SHARING PLAN, and GREGG
CAPLITZ
        Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

RECEIPT #_____
AMOUNT $ 150_____
SUMMONS ISSUED YES____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. R.O.W____
DATE 10 28 04_____

**VERIFIED COMPLAINT**
**Statement of the Case**

    This is an action for injunctive relief to compel the defendant 401(k) Profit

Sharing Plan (PSP), and the Plan Administrator/Trustee of said PSP to withdraw and

transfer plaintiff's funds in said PSP to another account, in accordance with the PSP and

federal ERISA law.

**Parties**

    1. Plaintiff Rudy K. Meiselman is a natural person 78 years of age, who is a

citizen of Florida. He is a participant in a PSP in which defendants are fiduciaries.

    2. Defendant Financial Resources Network, Inc., (FRNI) d/b/a Insight Onsite

Financial Solutions, is a Massachusetts for-profit corporation, with a business address of

424 Washington Street in Woburn, Massachusetts. FRNI is the Administrator under 26

U.S.C. §401(k) of a Profit Sharing Plan (PSP) for its employees, as promulgated pursuant to the Employee Retirement Income Security Act of 1997 (ERISA), as amended, 29 U.S.C. §1001, et seq.

3. Defendant Rosalind Herman, (Herman) is a natural person with a last known address of 27 Davis Street, Woburn, Massachusetts. Herman is President, Treasurer, Secretary and a Director of FRNI, as well as, upon information and belief, sole shareholder. Herman is also Trustee of the FRNI PSP. Herman in her business capacity acts as the PSP Administrator and sole trustee of the 401(k) profit sharing plan on behalf of FRNI.

4. Defendant Gregg Caplitz (Caplitz) is upon information and belief, an undisclosed principal of FRNI, who exercises control over all of its operations, including but not limited to the administration of the PSP. PSP named Caplitz its "Control Person" in the form ADV application it submitted to the Securities and Exchange Commission for registered investment advisor status.

### Jurisdiction

5. Jurisdiction and venue are conferred by 29 United States Code §1132(a) and (e), which state in pertinent part:

> § 1132. Civil enforcement
> (a) Persons empowered to bring a civil action. A civil action may be brought--
>   (1) by a participant or beneficiary--
>     (A) for the relief provided for in subsection (c) of this section, or
>     (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan......
>   (3) by a participant... to enjoin any act or practice which violates any provision of this title or the terms of the plan...or to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan...

(e) Jurisdiction.
(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this title brought by the Secretary or by a participant.... State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.
(2) Where an action under this title is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

## **Factual Background**

6. Plaintiff became employed as a technical analyst by FRNI in 2002. In conjunction with his employment, Plaintiff was entitled to participate in FRNI's qualified 401(K) pension plan (the PSP), which he elected to do. In conjunction with plaintiff's employment, FRNI furnished plaintiff with a document dated March 27, 2002 entitled "A Summary Description of Financial Resources Network, Inc. 401(k) Profit Sharing Plan". ("PSP Summary" hereinafter, copy attached hereto and incorporated herein by reference as Exhibit 1). Plaintiff executed a rollover of his pre-existing retirement funds in excess of Eleven Million ($11,242,853.20) Dollars into the FRNI PSP. No portion of this amount would be considered elective contribution.

7. Defendants for good and valuable consideration contractually bound themselves to comply with the provisions of the PSP on plaintiff's behalf, and owe him a fiduciary duty under law to act in his best interests.

8. Although FRNI was required by the PSP Plan Summary to maintain the aforesaid funds in a separate Rollover Account, it did not do so.

9. Pursuant to the PSP Plan Summary, plaintiff was 100% vested in the Rollover Account FRNI should have created on his behalf, and was and is entitled at any time to withdraw the funds placed therein.

10. In addition, regardless of the rollover status of plaintiff's PSP assets, his age of 78 allows him under the PSP Plan Summary to withdraw all of his funds from the PSP at any time.

11. Highly relevant to the injunctive relief sought herein is the history of plaintiff's disenchantment with the actions of Herman and Caplitz. In particular, plaintiff took issue with certain fees he was being charged, as well as the unilateral decision by Caplitz and Herman to place an enormous ($22,000,000.00 death benefit) insurance policy on the lives of plaintiff and his wife, the premium on which defendants paid out of plaintiff's 401(K) assets, *without his assent.* This violated the PSP and federal law, and it was done so that Caplitz, who is also an insurance broker, would earn a large commission (over $500,000.00) from the issuing insurer. This was an insurance policy plaintiff neither wanted nor needed. Defendant's actually wired funds from plaintiff's PSP assets to the life insurer, *without plaintiff's assent.*

12. Although plaintiff through great effort has had that life insurance policy rescinded on the basis of gross misrepresentations by the defendants in the insurance application and, has had the premium returned to his PSP account, defendant's breach of fiduciary duty ruined plaintiff's confidence in them, and he determined that he had to withdraw all of his PSP assets into a Rollover IRA account.

13. On or about June 30, 2004, plaintiff sent by certified mail the first of several certified mail letters a to Herman (copy attached hereto and incorporated herein by

reference as <u>Exhibit 2</u>), in which, inter alia, he directed Herman, in her capacity as trustee and administrator, to **"immediately respond to the request and wire out all assets in my accounts as a distribution from my PSP accounts to my rollover Profunds IRA account"**. In that letter, plaintiff provided Herman with detailed, accurate wiring instructions.

14. To date, almost four full months later, there has been no response at all by Herman, FRNI or anyone on their behalf to plaintiff's June 30, 2004 directive, or to the several subsequent ones, nor has there been any compliance with plaintiff's directives.

**Exhaustion of Administrative Remedies**

15. Plaintiff denies that exhaustion of administrative remedies doctrine applies to this claim for injunctive relief, but further states that his attempt to comply with the administrative remedies set forth in the PSP Plan Summary have been utterly ignored by defendants. See Paragraphs 13, 14 above. Indeed, defendant Herman has informed plaintiff via facsimile transmission that her office will no longer accept any mail from him, and that all further communications should be directed to her attorney, Wayne Murphy. Prior to engaging undersigned counsel last week, Plaintiff has repeatedly attempted to contact Attorney Murphy by certified mail and telephone messages, with no response by Attorney Murphy whatsoever.

**Count I: Breach Of Contract**

16. Plaintiff hereby reasserts herein all allegations of Paragraphs 1-15 above as if fully set forth again.

17. The PSP creates contractual obligations on the part of defendants to comply with its terms and conditions for plaintiff's benefit, as it was entered into for consideration.

18. Defendants breached their contractual obligations by, inter alia, ignoring and failing to comply with plaintiff's June 30, 2004 directive, as more fully set forth above.

19. As the direct proximate result of defendants' breach of contract as more fully set forth above, plaintiff has suffered the loss of his right to direct his retirement funds exactly as he chooses, loss of use of such funds, and other damages to be proven at trial

## Count II: Breach Of Fiduciary Duty

20. Plaintiff hereby reasserts herein all allegations of Paragraphs 1-19 above as if fully set forth again.

21. At all times relevant hereto, defendants owed plaintiff a fiduciary duty pursuant to the PSP and 29 United States Code § 1104, which states in pertinent part:

> (a) Prudent man standard of care.
> (1) Subject to sections 403(c) and (d), 4042, and 4044 [29 USCS §§ 1103(c), (d), 1342, 1344], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...

22. Defendants violated their fiduciary duty by a) failing to create a segregated Rollover Account for plaintiff's initial PSP fund transfer; b) by failing to comply with plaintiff's directives, and removing money from his account without authority.

23. Plaintiff is a 78 year-old retired surgeon, working now as a financial analyst. Virtually all of his assets are in the PSP. Plaintiff has a carefully constructed and intricate wealth preservation and estate plan, the successful deployment of which requires that he be able to freely trade securities according to specific needs within his retirement fund accounts, including the PSP. Defendant Caplitz has hampered and continues to hamper plaintiff's access to trading his own funds within the PSP, thus preventing the successful deployment of his wealth preservation and estate plan.

24. Plaintiff will be irreparably harmed, and has no adequate remedy at law if defendants, who are essentially two individuals running a shell company, continue to help themselves to his retirement monies, and hamper his trading access. His carefully constructed wealth preservation and estate plans will not be fully deployed in the absence of the injunctive relief sought, and he will be at risk of further illegal handling of his PSP assets. Plaintiff is entitled by statute to injunctive relief.

25. Immediate injunctive relief will cause no harm to defendants. They will run their business as they see fit. They simply will no longer be able to control plaintiff's wealth. Plaintiff's undersigned counsel has certified below his attempts to provide notice to purported counsel for defendants.

26. Plaintiff hereby asserts entitlement to the court's exercise of discretion to award him his attorney's fees and costs, pursuant to 29 United States Code § 1104(g), which states in pertinent part:

> (1) In any action under this title (other than an action described in paragraph 2) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

WHEREFORE, Plaintiff seeks the following relief against the defendants:

1.      Immediate temporary relief in the nature of the restraining order and

        mandamus set forth in the proposed <u>Order</u>, which is attached hereto and

        herein incorporated by reference; then a preliminary injunction, and a

        permanent injunction;

2.      Damages to be proven at trial, with interest as applicable; and

3.      Reasonable attorney's fees and costs'

4.      Such further relief as the interests of justice require.

Dated: October 28, 2004          RUDY K. MEISELMAN,
                                 By his attorney,
                                 LAW OFFICE OF CHARLES P. KAZARIAN, P.C.


                                 Charles P. Kazarian, Esq. BBO#. 262660
                                 77 North Washington Street
                                 Boston, Massachusetts 02114
                                 (617) 723-6676

## CERTIFICATION OF COUNSEL

        I, Charles P. Kazarian, hereby certify that on October 27, 2004 at 3:55 p.m. I
attempted to contact by telephone the following, identified to me by my client as counsel
for the defendants:

                           Wayne Murphy, Esq.
                           Murphy & Flaherty
                           43 Bowdoin Street
                           Boston, MA 02114
                           (617) 227-7777
        In so doing, I received an answering machine message directing me to Attorney
Murphy's voicemail, upon which I left a message briefly summarizing my client's
position in this matter, and notifying him that I intended to seek injunctive relief in this
court in the late afternoon of October 28, 2004, as I had a hearing scheduled before Judge
Zobel in a different case at 2:30. I also delivered a copy of the forgoing to his office by
messenger on the morning of October 28, 2004.


                                 Charles P. Kazarian

## VERIFICATION

I, Rudy K. Meiselman, hereby verify and swear under the penalties of perjury that the factual assertions set forth hereinabove in this Verified Complaint are true according to my own personal knowledge except where stated upon information and belief, in which instance said factual assertions are true according to the best of my information and belief.

_____
Rudy K. Meiselman



# A SUMMARY PLAN DESCRIPTION OF

# FINANCIAL RESOURCES NETWORK, INC.

# 401(K) PROFIT SHARING PLAN

March 27, 2002

# TABLE OF CONTENTS

INTRODUCTION ........................................................... Page 1
    Type Of Plan ........................................................ Page 1
    Administration Of The Plan ...................................... Page 1

PLAN PARTICIPATION ................................................... Page 1
    Eligibility Requirements .......................................... Page 1
    Eligibility Year Of Service ....................................... Page 1
    Break In Service Rules ........................................... Page 2
    Entry Date ........................................................ Page 2

CONTRIBUTIONS AND ALLOCATIONS ................................. Page 2
    Elective Deferrals ................................................ Page 2
    Salary Deferral Election Forms .................................. Page 2
    Matching Contributions ........................................... Page 2
    Non-Elective Contributions ....................................... Page 2
    Definition Of Compensation ...................................... Page 3
    Participants Eligible For Allocations ............................. Page 3
    Top Heavy Contributions ......................................... Page 3
    Rollover Contributions ............................................ Page 3

BENEFIT UPON RETIREMENT .......................................... Page 3

BENEFIT UPON DISABILITY ............................................ Page 4

BENEFIT UPON DEATH ................................................. Page 4

BENEFIT UPON TERMINATION OF EMPLOYMENT ................... Page 4

DETERMINATION OF VESTED INTEREST ............................. Page 4

PARTICIPANT LOANS .................................................. Page 5
    General Loan Requirements ...................................... Page 5
    Repayment and Default ........................................... Page 5

INVESTMENT OF CONTRIBUTIONS .................................... Page 5

TAX WITHHOLDING ON PLAN BENEFITS .............................. Page 5
    Distributions Not Subject To Withholding ........................ Page 5
    Distributions Subject To Withholding ............................ Page 6

OTHER INFORMATION .................................................. Page 6
    Claims For Benefits .............................................. Page 6
    Non-Alienation Of Benefits ....................................... Page 6
    Amendment Or Termination ....................................... Page 6

STATEMENT OF ERISA RIGHTS ....................................... Page 7

# INTRODUCTION

### Type Of Plan

Effective January 1, 2002, Financial Resources Network, Inc. (hereafter referred to as the Employer) established a 401(k) profit sharing plan, which is called the Financial Resources Network, Inc. 401(k) Profit Sharing Plan (hereafter referred to as the Plan). This summary, which describes the important features of the Plan in non-technical language, is intended to answer most of your questions about the Plan and replaces all prior announcements by the Employer about the Plan. It nevertheless is only a summary, and if there is any conflict between the description in this summary and the terms of the Plan, the terms of the Plan will control. If you have any questions about the Plan that are not addressed in this summary, you can contact the Administrator.

### Administration Of The Plan

The Plan is administered by a written plan and trust agreement, and the trustee of that agreement is responsible for the Plan's investment policy. The name and the address of the Trustee are:

Rosalind Herman
424 Washington Street
Woburn, MA 01801

All other matters concerning the operation of the Plan are the responsibility of the Administrator. The name, address, telephone number and employer I.D. number (EIN) of the Administrator are:

Financial Resources Network, Inc.
424 Washington Street
Woburn, MA 01801
Tel (781) 935-7070
EIN 03-3256270

The Employer has assigned number 001 to the Plan; the accounting year of the Plan, called the Plan Year, begins January 1st and ends the following December 31st; and if it becomes necessary for you to bring legal action against the Plan for any reason, legal process can be served on either the Administrator, the Employer, or the Trustee.

# PLAN PARTICIPATION

### Eligibility Requirements

You will be eligible to enter the Plan as a Participant (1) in order to make Elective Deferrals, when you complete 3 months of service; and (2) in order to receive an allocation of Non-Elective Contributions and Matching Contributions, when you reach Age 21 and complete 1 Year of Service.

### Eligibility Year Of Service

To be credited with a Year of Service for eligibility purposes, you must be credited with at least 1,000 Hours of Service during an eligibility computation period. An eligibility computation period is a 12-consecutive month measuring period. An Hour of Service is any hour for which you have a right to be paid, including vacations, holidays, illness, back pay and maternity or paternity leave.

The first eligibility computation period begins on your employment commencement date and ends the day before the first anniversary of your employment commencement date. If you are not credited

with at least 1,000 Hours of Service during the first eligibility computation period, the second eligibility computation period will switch to the Plan Year and will overlap the first eligibility computation period by beginning on the January 1st which occurs prior to the first anniversary of your employment commencement date. If you are not credited with at least 1,000 Hours of Service during the second eligibility computation period, each succeeding eligibility computation period begins on January 1st and ends on December 31st.

**Break In Service Rules**
In any Plan Year in which you do not receive credit for at least 501 Hours of Service, you will incur a Break in Service and your participation in the Plan will cease; but you will not incur a Break in Service if you are on an authorized leave of absence, you are ill, or you are on maternity leave.

**Entry Date**
You will actually enter the Plan as a Participant (1) in order to make Elective Deferrals, on the first day of the month which coincides with or next follows the date on which you satisfy the eligibility requirements for Elective Deferrals; and (2) in order to receive an allocation of Non-Elective Contributions and Matching Contributions, on the January 1st nearest the date you satisfy the eligibility requirements for Non-Elective Contributions and Matching Contributions. Upon becoming a Participant, the Administrator will establish an Account to receive your share of any Employer contributions and investment earnings and losses. The total value of your Account will consist of the sum of the following sub-accounts: the Elective Deferral Account, the Matching Contribution Account and the Non-Elective Contribution Account.

# CONTRIBUTIONS AND ALLOCATIONS

**Elective Deferrals**
You can sign a salary deferral election form authorizing the Employer to withhold up to the maximum annual dollar limit permitted by law (which is currently $10,500 per year). The amount you elect to defer is called an Elective Deferral. The Employer will allocate your Elective Deferrals to your Elective Deferral Account.

**Salary Deferral Election Forms**
You can change your salary deferral election form quarterly on dates determined by the Administrator. You can also suspend or cancel your election form effective 30 days after giving written notice to the Administrator, in which case you cannot make a new election until the next quarterly election date. In any Plan Year in which you have not deferred at the maximum rate permitted by the Plan, you can authorize that up to 100% of your Compensation be withheld for one or more pay periods in order to raise your deferral to the maximum rate. If necessary to insure that the Plan satisfies certain non-discrimination tests required by the Internal Revenue Code, the Employer also has the right to reduce or suspend your deferral election at any time.

**Matching Contributions**
The Employer may make a discretionary Matching Contribution each Plan Year. Matching Contributions will be allocated to your Matching Contribution Account.

**Non-Elective Contributions**
The Employer may also make other discretionary contributions to the Plan. These contributions are called Non-Elective Contributions. In any Plan Year in which Non-Elective Contributions are made and in which you are an eligible Participant, an allocation will be made to your Non-Elective Contribution Account based on the ratio that your Compensation bears to the total Compensation

**Page 2**

of all eligible Participants for that Plan Year. This means that the amount allocated to your Account will, as a percentage of Compensation, be the same that is allocated to all other eligible Participants. For example, if the Employer makes a contribution equal to 10% of the total Compensation of all Participants, and your Compensation for the year is $25,000, the amount allocated to your Account would be $2,500 ($25,000 times 10%).

## Definition Of Compensation

The amount of your Compensation used to determine Plan benefits is the amount reported on your Form W-2 during the period covered by the Plan Year, up to the maximum annual dollar limit permitted by law (which is currently $170,000 per year).

## Participants Eligible For Allocations

All Participants who are employed on December 31st will receive an allocation of all Employer contributions made for that Plan Year. Participants who terminate employment before December 31st will only receive a contribution allocation (including Matching Contributions) for that Plan Year as follows: (1) Participants who terminate because of retirement will receive an allocation regardless of Hours of Service; (2) Participants who terminate because of disability will receive an allocation regardless of Hours of Service; (3) Participants who terminate because of death will receive an allocation regardless of Hours of Service; and (4) Participants who terminate for any other reason will receive an allocation if they complete at least 1,000 Hours of Service.

## Top Heavy Contributions

A top heavy plan is a plan in which more than 60% of the assets of the Plan are allocated to Key Employees (certain owners and officers). For each year in which this Plan is top heavy, the Account of each Participant who is a Non-Key Employee and who is employed on December 31st will receive a minimum top heavy allocation equal to the lesser of 3% of Compensation or the percentage of Compensation allocated to the Accounts of Participants who are Key Employees.

## Rollover Contributions

If you participated in another retirement plan before you were employed by the Employer, you can transfer (or rollover) to this Plan any distribution you received from that plan provided all legal requirements (and any requirements imposed by the Administrator) with respect to such a transfer are satisfied. Do not withdraw funds from any other plan or account until you have received written approval from the Administrator to roll those funds into this Plan.

If you do decide to make a rollover contribution and it is accepted by the Administrator, it will be kept in a separate Rollover Account established on your behalf. You will at all times have a 100% Vested Interest in your Rollover Account. Your Rollovers can be withdrawn at any time.

# BENEFIT UPON RETIREMENT

You are entitled to 100% of your Account if you reach Normal Retirement Age before termination of employment. Normal Retirement Age is the date you reach age 65. If you continue working after retirement age, you can postpone receipt of your Account until you actually retire or you can have it distributed while you are still employed. Your Account will be distributed in a lump sum as soon as administratively feasible after you request payment.

### Distributions Subject To Withholding

If you choose to have your Plan benefit paid to you and the benefit is eligible to be rolled over, you only receive 80% of the benefit payment. The Administrator is required by law to withhold 20% of the benefit payment and remit it to the Internal Revenue Service as income tax withholding to be credited against your taxes. If you receive the distribution before you reach age 59½, you may also have to pay an additional 10% tax. You cannot elect out of the 20% withholding.

The only way to avoid the 20% withholding is to leave your benefit in this Plan or have it transferred directly to an IRA or to another qualified retirement plan that accepts rollovers. You can still rollover any eligible distribution that is paid to you by putting the eligible distribution into an IRA or into another qualified retirement plan within 60 days of receiving it. If you want to rollover 100% of the eligible distribution to an IRA or to another qualified retirement plan, you must find other money to replace the 20% that was withheld. Due to the complexities and frequency of changes in the federal tax law that governs withdrawal penalties and taxes, you should consult your tax advisor to determine your personal tax situation before taking any distribution from the Plan.

## OTHER INFORMATION

### Claims For Benefits

If you are not satisfied with a decision made about your benefits, you should submit a written claim to the Administrator. If your claim is denied, the Administrator will notify you within 90 days after you filed your claim. If your claim is denied, you can have the denial reviewed by making a written request to the Administrator, which along with a written statement explaining your position must be filed within 60 days of the date you were notified in writing that the claim was denied. The Administrator may (but is not required to) provide you with a hearing, but the Administrator must decide your appeal within 60 days and give written notice of the decision. If your claim for benefits is denied or ignored, in whole or part, you can file suit in a state or federal court.

### Non-Alienation Of Benefits

In general, your creditors cannot garnish or levy upon your Account, and you cannot sell, transfer, assign, or pledge your Account. There are two exceptions: (1) your Account must be pledged as collateral for a loan from the Plan; and (2) if you and your spouse separate or divorce, a court can direct through a qualified domestic relations order that up to 100% of your Account be transferred to another person (usually your ex-spouse or your children). The Plan has a procedure for processing domestic relations orders, which you can obtain from the Administrator.

### Amendment Or Termination

Although the Plan is intended to be permanent, the Employer can amend or terminate it at any time. Upon termination, all Participants will have a 100% Vested Interest in their Accounts as of the date of termination, and all Accounts will be distributed in a lump sum. Should the Plan ever be amended or terminated, each Participant and each beneficiary receiving benefits will be notified in writing.

Your Account is not insured by the Pension Benefit Guaranty Corporation (PBGC) because the insurance provisions of the Employee Retirement Income Security Act do not apply to 401(k) plans. For more information on PBGC coverage, ask the Administrator or the PBGC. Written inquiries to the PBGC should be addressed to the Technical Assistance Division, PBGC, 1200 K Street NW, Suite 930, Washington, D.C. 20005-4026, or you can call (202) 326-4000.

# STATEMENT OF ERISA RIGHTS

As a Participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Participants are entitled: (a) to examine without charge at the Administrator's office and at other specified locations (such as work-sites and union halls) all Plan documents, including insurance contracts, collective bargaining agreements and copies of all Plan documents filed with the U.S. Department of Labor, such as detailed annual reports and Plan objectives; (b) to obtain copies of all Plan documents and other information upon written request to the Administrator (who may make a reasonable charge); (c) to receive a summary of the Plan's annual financial report and a copy of the Administrator's summary annual report; and (d) to obtain a statement telling if you have a right to receive a pension at normal retirement age and if so, what your benefits would be if you stopped working now. If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a pension. This statement must be requested in writing, is not required to be given more than once a year, and must be provided by the Administrator free of charge.

ERISA also imposes duties upon the people responsible for the operation of the plan. These people, who are called fiduciaries, have a duty to do so prudently and in the interest of all Participants. No one, including the Employer, a union, or any other person, may fire you or discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your ERISA rights.

If your claim for benefits is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Administrator review and reconsider your claim. Under ERISA, there are steps you can take to enforce these rights. For instance, if you request materials about the Plan and do not receive them within 30 days, you may file suit in a federal court. If you do so, the court may require the Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the Administrator's control.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order, you may file suit in a federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about this Plan, contact the Administrator. If you have any questions about this statement or your rights under ERISA, contact the nearest Area Office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, NW, Washington, D.C. 20210.

**Rudy K. Meiselman, M. D.**
**110 Sand Hill Cove Road**
**Narragansett, R. I. 02882-5714**

Telephone 401 783 5560
Telefax    401 789 5808
Email      rudymeiselman@comcast.net

6/30/2004

VIA CERTIFIED MAIL

Mrs. Rosalind Herman
Financial Resources Network
424 Washington Street
Woburn MA 01801-2112

Dear Mrs. Herman:

As you well know, my wife and I were profoundly disturbed by your purchase of $22,000,000 of additional life insurance on our lives. Gregg presented this life insurance purchase to us as an option. We rejected it because we felt it was far too risky. Our decsion was based on our unwillingness to accept any risks, such as an increase in interest rates, failure of the bond portfolio to produce the assumed return, changes in the law related to life insurance purchases within a pension plan, and several other variables. You, on the other hand, imposed all of these risks on my family and me despite our objections. You denied my wife and me the right to inspect and reject the policy during the free-look period! You confirmed the purchase of the policy over our vehement objections!  How could you do this with a clear conscience?  I cannot comprehend how any trustee of a Profit Sharing Plan could feel she was acting properly in forcing a participant to purchase a life insurance policy his family does not need and does not want.

My current attorney is a senior partner in the largest law firm in Sarasota.  Neither she nor any of her partners has ever heard of a PSP trustee purchasing life insurance on the life of a participant with his own retirement funds, without his permission and over his objections.  We all agree that your explanation that it was your duty to go forward with the purchase despite our wishes and over our objections is utterly absurd!

Without a financial reversal imposed upon us, our current family assets are more than sufficient to sustain us well into the future.  Our children will benefit from substantial inheritances. There was no need that any dramatic change in our estate plan be made, and certainly no change should be imposed upon us by you. Had I not been successful in canceling your 22 million life insurance purchase the burden of this policy would have had a catastrophic impact on our family's financial security.  My accountant agrees with my assessment.

We have purchased and still own substantial life insurance coverage.   This coverage, according to my considered judgment, is sufficient to pay the inheritance taxes on the retirement funds and other assets our children will inherit from my wife and me. That is the only need we have for life insurance. We do not need more life insurance than the

$22,000,000 that we have currently. My $20,000,000 variable ING Security Life policy is robustly healthy and currently has a cash corpus such that it can be exchanged into a guaranteed policy which will persist until my wife's age 103 years. There was absolutely no need for me to exchange this policy into the variable policy that Gregg recommended. I had the right to refuse that exchange and I did refuse it.

The impact of borrowing from my PSP account to fund the Indianapolis Life insurance premiums, which you insisted upon, would have been extraordinarily imprudent. As you know, we do not have the funds necessary to purchase the policy out of the plan after the total of $4,100,000 of premiums are paid. Acknowledging this, Gregg and you wrote me that you made arrangements for us to borrow the money necessary to pay the purchase price. Clearly, when the policy is purchased out of the plan the borrowing costs will be paid for with after tax dollars. Gregg knows we do not have the assets to pay the buy out cost or the continuing borrowing costs. If my wife lives to age 95; the age at which her mother died, the total of after-tax interest costs for the purchase will account for a substantial part of the death benefit that will flow from the policy upon the second death. It would not be simply imprudent but foolhardy to pay cash for this buy-out with after-tax withdrawals from my retirement funds.

My wife and I were distinctly offended that you ordered the purchase of this policy without our permission and then confirmed the purchase over our vigorous objections. We did not sleep for over two weeks when we realized the financial impact of your outrageous act. Your decision to put all of the assets in my two retirement accounts on margin without notice to me and without my permission, and your refusal of my request to remove the margin agreement from my accounts is an additional outrage.

I worked 12 hours a day for the past six months attempting to right this wrong, and was ultimately successful. Had I paid an attorney to perform the research I performed, his fees would have been extraordinary. An ERISA attorney whom I contacted in January was very gracious, made some helpful suggestions, but said he felt he could not handle my case cost-effectively. Fortunately I no longer have a busy surgical practice, have ample free time, and am very compulsive. I was determined to seek and achieve justice.

Early in my employment with your firm, in 2002, Gregg solicited me to purchase a similar life insurance policy within the plan. In a letter to me he recommended that I send in the first premium from my PSP account and examine the policy during the free look period. He stated in his letter that if I should decide that I do not want to keep the policy I could order its cancellation during the free-look period. It is unclear to me why, in this similar instance, you stepped in as trustee and imposed your will over mine, relying for your authority on the PSP's ownership of the policy. The pension plan's ownership of the policy was achieved by an unlawful act on your part, according to ERISA rules. Your refusal to accept my considered prudent choice to refuse the policy is an affront to my judgment and intelligence.

A recent review of the transactions in my PSP account revealed that you ordered the payment of $2,500 out of my account to pay the PSP consultant's fee and $2,000 to pay the accounting fee – all without my permission and without notification to me. What you have done is contrary to IRC 401(a)(13) and is yet another outrage. These charges should be corrected and the deductions returned to my account immediately before excise penalties are imposed upon your firm by the IRS for your infraction of the rules.

2

Following return by the life insurance company of the unlawful premium payment you ordered wired from my PSP account I found that you or Gregg directed that these funds be placed in a "segregated account". Gregg knew very well that you removed this amount unlawfully from account #51316472. It should be returned to the same account. Gregg or you diverted the wire to a segregated account. On the following day I found that the segregated funds were no longer listed in my Waterhouse PSP accounts. When I called Gregg he told me that "it makes no difference since, you are not going to invest these funds". I do not know who made that decision, you or Gregg. As trustee of the PSP you have absolutely no legitimate right to segregate and encumber assets of my PSP account. The premium amount was removed unlawfully from my account #51316472 and should be returned to that account. In diverting these funds to another account you have disrupted the beneficiary arrangements I have made for my retirement assets.

The sum of these outrages, Mrs. Herman, has led my wife and me to order the removal my retirement funds from your control. We must take steps to insure there is no opportunity for you or anyone else to disrupt once again our carefully constructed estate plans.

You will receive a request from the Profunds Company to wire-transfer funds from my PSP account to a rollover IRA. When you do, I direct you, as the Trustee of my PSP account, to immediately respond to the request and wire out all assets in my accounts as a distribution from my PSP accounts to my rollover Profunds IRA account.

The wiring instructions are:

Huntington Bank
Columbus Ohio
ABA #044000024
Acct. # 01892150549
For credit to
Rudy K. Meiselman Rollover IRA
Social Security 039 14 2759
Account # 1460714

I want to stress that I am not retiring or leaving my position at Financial Resources Network. Gregg is well aware that there has been a change in my health status and the need to remove the assets from my PSP account could well be imposed upon me in the near future. I do not intend to retire unless I become disabled. I cannot be certain when that might be.

My plan initially will be to send a portion of my rollover IRA to Price Capital Management to lock in the position you withdrew from their Flex Q fund over my objections. In the interim I shall manage the remainder of my rollover IRA at Profunds. My instructions to my executor are to order the roll over of the remaining portion of my Profunds IRA account to PCM in the event of my death or disability. This will allow my family to take advantage of using margin in the retirement account without the need to pay UBTI. Although I or my heirs will have to begin taking RMDs as of April 2005, I believe that the superior management of PCM and the ability to use margin without UBTI will go a long way towards making up for the need to take RMDs in my IRA.

Having achieved my goal of cancellation of the Indianapolis Life policy and the return of the initial premium I am very pleased. I harbor no residual animosity toward you or Gregg, despite what I believe was your grossly improper treatment of my family. I cannot, however, forgive you for the pain you inflicted upon my wife and me by your unlawful actions. I am willing to put aside the outrages that have occurred now that the policy is cancelled and I have placed by retirement assets beyond interference by others. I shall not press any of the outstanding complaints that I have filed with various government agencies. If you wish, I am willing to write to each of them, informing them that the problem has been resolved and that I am withdrawing my complaints. If you continue attempts to obstruct the decsion of the insurance company to return the premium unlawfully removed from my account I shall feel no constraints about pursuing outstanding complaints.

You spoke highly of my value as an employee in your company in your letter to me in late November 2003. I hope the need you imposed upon us now to protect our family's retirement assets by removing them to an IRA does not provoke illegal retaliation and unlawful termination of my employment.  I believe I am protected from this by the "whistle-blower" rules of the EOEC and the Sarbanes-Oxley law.

Very truly yours,



Rudy K. Meiselman, M. D.

4